IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| SUSAN E. ARNOLD | ) | |
| --- | --- | --- |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 16-cv-146-JPG-CJP |
| | ) | |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant.[1] | ) | |

## MEMORANDUM and ORDER

In accordance with 42 U.S.C. § 405(g), plaintiff Susan E. Arnold, represented by counsel, seeks judicial review of the final agency decision denying her application for Supplemental Security Income (SSI) and Disability Insurance Benefits (DIB) pursuant to 42 U.S.C. § 423.

## Procedural History

Ms. Arnold filed for DIB and SSI on August 6, 2012, alleging an onset date of May 7, 2012. (Tr. 26.) After holding an evidentiary hearing, Administrative Law Judge (ALJ) Kim L. Bright denied the application on July 9, 2014. (Tr. 26-37.) The Appeals Council denied review, and the decision of the ALJ became the final agency decision. (Tr. 1.) Administrative remedies have been exhausted and a timely complaint was filed in this Court.

## Issues Raised by Plaintiff

Plaintiff raises the following points:

1. The ALJ erred by finding plaintiff's symptoms were inconsistent with the evidence in the record.

2. The ALJ improperly "played doctor" when she determined plaintiff's residual functional capacity (RFC) without expert evidence.

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security. *See* https://www.ssa.gov/agency/commissioner.html (visited Feb. 7, 2017). She is automatically substituted as defendant in this case. *See* Fed. R. Civ. P. 25(d); 42 U.S.C. § 405(g).

3. The ALJ erred by failing to give the opinion of plaintiff's treating physicians controlling weight.

**Applicable Legal Standards**

To qualify for SSI and/or DIB, a claimant must be disabled within the meaning of the applicable statutes.[2] For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. 42 U.S.C. § 423(d)(3). "Substantial gainful activity" is work activity that involves doing significant physical or mental activities and that is done for pay or profit. 20 C.F.R. § 404.1572.

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity

---

[2] The statutes and regulations pertaining to DIB are found at 42 U.S.C. § 423, *et seq.*, and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, *et seq.*, and 20 C.F.R. pt. 416. As is relevant to this case, the DIB and SSI statutes are identical. Furthermore, 20 C.F.R. § 416.925, detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

> ("RFC") and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Craft v. Astrue*, 539 F.3d 668, 674 (7th Cir. 2008); *accord Weatherbee v. Astrue*, 649 F.3d 565, 568-69 (7th Cir. 2011).

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience. 20 C.F.R. § 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-13 (7th Cir. 2009); *Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992).

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three. If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job. *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984); *see also Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001) (Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled…. If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made. It is important to recognize that

the scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g). Thus, this Court must determine not whether Ms. Arnold was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. *See Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)). This Court uses the Supreme Court's definition of substantial evidence, *i.e.*, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997); *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. *See Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

## The Decision of the ALJ

ALJ Bright followed the five-step analytical framework described above. She determined that plaintiff had not been engaged in substantial gainful activity since the alleged onset date and that plaintiff had the following severe impairments: colon, rectal cancer status post radiation therapy, chemotherapy, and resection; degenerative disc disease of the lumbar spine; and pulmonary emphysema. (Tr. 28.) ALJ Bright then concluded that plaintiff had the RFC to perform light work, except that plaintiff should avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation. (Tr. 30.) Finally, the ALJ found that plaintiff could perform past relevant work and, thus, was not disabled. (Tr. 35-36.)

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by plaintiff.

**1.  Agency Forms**

Plaintiff was born on December 13, 1964, and was forty-seven years old on the alleged onset date. (Tr. 257.) Plaintiff worked as a press operator from 1994 until 2002, as a bartender in 1995, and as a finish grinder from approximately 2007 until 2012. (Tr. 262.) She alleged her surgery from colon cancer limited her ability to lift, walk, and stand for long periods of time and ultimately prevented her from working. (Tr. 286.)

**2.  Evidentiary Hearing**

Plaintiff was represented by counsel at the hearing on May 19, 2014. (Tr. 46.) She testified that she lived with her boyfriend, who was disabled. (Tr. 51.) She did not have a driver's license because she received a DUI when she was about twenty years old. *Id.* Plaintiff completed the ninth grade and could read and write. (Tr. 52.) Plaintiff never received vocational training and had never been in the military. *Id.*

Plaintiff worked on the presses, in quality control, and in grinding areas at the Brico Metals factory in 1999. (Tr. 52-52.) Plaintiff was unemployed from 2002 to 2006 because she was tending to her grandmother, who was dying of cancer. (Tr. 53.) In 2007, plaintiff worked as a finish grinder at Rowe Foundry. (Tr. 53-54.) She also worked as a finish grinder at Gartland Foundry from 2010 to 2012. (Tr. 54.) She left Gartland after she was diagnosed with cancer in April 2012 because she was no longer able to lift heavy objects. *Id.*

Plaintiff completed chemotherapy after her diagnoses and then underwent surgery in

September 2013. (Tr. 54-55.) Following surgery, plaintiff received weekly chemotherapy for six weeks. *Id.*

Plaintiff was unable to work because she could not stand for long periods of times and was unsure if she could lift. (Tr. 57.) She also experienced incontinence and difficulty breathing. *Id.*

Plaintiff took hydrocodone for her legs, two different medications in her nebulizer, Lamisil for a toe fungus, and nausea pills. *Id.* Her medications made her jittery and sleepy. *Id.*

On a good day, plaintiff could sit for thirty minutes at a time. (Tr. 59.) She had approximately two good days per week. *Id.* Plaintiff could stand for thirty minutes before her legs would start to give out and she would get sick. (Tr. 60.) She could walk 100 feet without difficulty breathing. *Id.* She was able to lift a gallon of milk out of the refrigerator, but that was "about it." *Id.* Plaintiff also was constipated or experienced incontinence at least once per week. *Id.* Before being diagnosed with cancer, plaintiff worked ten to twelve hours per day. (Tr. 62.)

Plaintiff saw Dr. Turner, Dr. Mannion, and Dr. Elizabeth Smith on a regular basis.[3] *Id.* Dr. Smith and Dr. Mannion were plaintiff's oncologists and Dr. Turner was plaintiff's family physician. (Tr. 61.)

After plaintiff's surgery, she began experiencing stomach pains and incontinence. (Tr. 62.) Plaintiff also had sciatic nerve damage in her legs, which Dr. Turner opined was most likely related to the chemotherapy or surgery. (Tr. 63.) Plaintiff completed three fifteen-minute nebulizer treatments per day. *Id.* The treatments made her jittery for a few minutes afterwards, so she would lay down for a half-hour nap. (Tr. 64.)

Mr. Fisher, a vocational expert (VE), then testified that plaintiff's previous employment

---

[3] At the hearing, Ms. Arnold refers to Dr. Smith and Dr. Mannion. However, based on the medical records, the Court believes these references should be to Dr. Schmidt and Dr. Manyam.

as a grinder was considered semi-skilled, heavy work. (Tr. 67.) The VE described plaintiff's position at Brico Metals as a sintering press operator, which he classified as light work. *Id.* Mr. Fisher opined that a hypothetical individual of plaintiff's age and education, with the same past relevant work history and limitations of medium work, would be able to perform plaintiff's previous job as a sintering press operator. *Id.* The hypothetical individual would not, however, be able to work as a grinder. (Tr. 68.) There were also other medium, unskilled positions available in Illinois that such an individual could perform, such as a hospital cleaner and a machine cleaner. (Tr. 68.)

The VE then considered the same hypothetical person, but with light work limitations. *Id.* He opined that this person could perform plaintiff's past work as a sintering press operator and could also work as a housekeeper and small products assembler, which were both available in Illinois. (Tr. 69.)

Finally, the VE opined that his analysis would not change if an individual in either hypothetical also had to avoid concentrated exposure to fumes, odors, dust, gases, and poor ventilation. *Id.*

The VE explained that ordinary breaks in a workday consisted of two regularly scheduled breaks, lunch, and an additional ten to fifteen-minute unscheduled break. *Id.* An employee was normally required to be "on task" ninety percent of the workday. (Tr. 70.) Absenteeism in unskilled work was one day per month. *Id.*

### 4. Medical Records

In April 2012, plaintiff presented to Dr. Mullins with pain in her left abdomen, abnormal bowel movements, irregular periods, weight loss, and fatigue. (Tr. 688-91.) On May 1, 2012, a CT scan of her abdomen and pelvis showed a follicle in the left adnexal area, a cyst in the right

7

adnexal area, and a low density nodule anteriorly in her right kidney. (Tr. 588.) Plaintiff's doctor excused her from work through May 7 and prescribed her Ultram for pain with an instruction not to take it while working. (Tr. 706-10.) On May 14, 2012, plaintiff underwent a colonoscopy, which found a rectal mass. (Tr. 715.) A CT scan from May 23, 2012, "showed only some emphysema." (Tr. 719.) On June 1, 2012, plaintiff underwent a lower endoscopic ultrasound which was unsuccessful due to a rectal mass. (Tr. 333-35.) The physician recommended chemotherapy. *Id.* On June 4, 2012, plaintiff began preoperative chemotherapy with radiation under Dr. Vani Manyam's care. (Tr. 442.) She complained of frequent bowel movements and left lower quadrant abdominal pain that had persisted continuously for four weeks. (Tr. 440.) On June 12, 2012, plaintiff underwent her second week of chemotherapy and told Dr. Manyam that she felt good, had a good appetite, had fair energy, but got tired easily. (Tr. 447.) During her third week of chemotherapy, plaintiff reported nausea and vomiting the day before, wanting to sleep all the time, and intermittent pain in her left side. (Tr. 454.)

On August 14, 2012, plaintiff presented to Dr. Elizabeth Schmidt following completion of her chemotherapy and stated that she experienced rectal pain with bowel movements, as well as radiation burns, but that both had improved. (Tr. 370.) Dr. Schmidt discussed surgical intervention with plaintiff. *Id.* On August 22, 2012, plaintiff denied abdominal pain, nausea, vomiting, diarrhea, chest pain, shortness of breath, or palpitation, and also stated she had a good appetite. (Tr. 416-17.)

On September 6, 2012, plaintiff underwent a low anterior resection and a cystoscopy with bilateral ureteral stent placement. (Tr. 375.) She exhibited no signs of postoperative complications and was discharged on September 16, 2012. (Tr. 367.) Plaintiff was instructed not to drive or life over five pounds. *Id.* On October 3, 2012, Dr. Ackley reported that plaintiff

felt fairly well and, other than some residual abdominal land pelvic tenderness, she experienced no severe symptoms. (Tr. 1580.) She told Dr. Ackley her bowels and bladder were working well. *Id.*

Plaintiff underwent postoperative chemotherapy over the course of approximately four months. (Tr. 754-800.) On October 24, 2012, plaintiff reported occasional left lower quadrant pain, which was resolved after a bowel movement. (Tr. 816.) On November 2, 2012, plaintiff reported experiencing long bone pain, which she rated at a three out of ten. (Tr. 807.) On November 6, 2012, plaintiff reported she had pain in her legs that she rated at a two out of ten but otherwise denied "problems or concerns". (Tr. 803.) Plaintiff attended five appointments from November 19, 2012, through December 17, 2012. (Tr. 777-800.) She denied experiencing any significant symptoms, such as nausea, vomiting, and diarrhea. *Id.* Dr. Manyam also noted plaintiff was tolerating chemotherapy "quite well." (Tr. 778.) On December 21, 2013, plaintiff complained of lower abdominal pain, for which she received a CT scan of her abdomen and pelvis. (Tr. 952.) The scan revealed a small cyst in plaintiff's right kidney. (Tr. 953.) On January 2, 2013, plaintiff attended a follow-up appointment with Dr. Manyam and reported intermittent back and leg pain, which she believed was a result of sitting too long. (Tr. 768.) On January 7, 2013, plaintiff complained of pain in her lower legs that she rated at a two out of ten. (Tr. 762.) On January 14, 2013, plaintiff underwent her sixth cycle of chemotherapy and complained of nausea, weakness, fatigue, aching all over, and tingling feet following her last round of chemotherapy. (Tr. 756-58.) Dr. Manyam noted that she "seem [sic] to have improved now." (Tr. 759.) On January 21, 2013, plaintiff presented to Dr. Manyam for the seventh cycle of chemotherapy. (Tr. 754.) He noted she was tolerating chemotherapy "quite well" and she denied significant symptoms. (Tr. 753-54.) She did, however, complaint of musculoskeletal

9

pain. *Id.* On January 29, 2012, plaintiff presented to Dr. Manyam and reported diarrhea the day before and tingling numbness in her fingers and toes. (Tr. 747.) Plaintiff also admitted to experiencing mild symptoms of peripheral neuropathy, musculoskeletal pain, and intermittent nausea, which was controlled with antiemetics. (Tr. 747-48.) On February 5, 2013, plaintiff underwent her eighth cycle of chemotherapy. (Tr. 934.) She reported tingling numbness in her fingers and toes. (Tr. 937.)

On February 27, 2013, plaintiff attended a follow-up appointment with Dr. Ackley regarding her radiation therapy. (Tr. 1043.) Dr. Ackley noted, "Ms. Arnold reports she feel fairly well. She denies bowel or bladder problems or bony pain." *Id.*

Plaintiff was admitted to Union Hospital on March 20, 2013, with a principal diagnosis of malignant neoplasm of rectum. (Tr. 1011.) Plaintiff presented to Cork Medical Center on May 3, 2013, with complaints of numbness in her left leg which had persisted for two to three weeks. (Tr. 1486.) On May 8, 2013, plaintiff presented to Union Hospital with an admitting diagnosis of "pain in limb." (Tr. 1006.) An MRI revealed spondyloarthropathy at L4/5 with mild narrowing of the central canal and mild to moderate narrowing of the left neurofaramina. (Tr. 1009.) Facet and ligamentum flavum hypertrophy was present at the T12/L1. *Id.* The physician also noted, "Mild diffuse increased T1 and T2 signal is seen within the sacrum and iliac bones." *Id.*

On July 10, 2013, plaintiff reported constant pain in her legs. (Tr. 1483.) On July 29, 2013, plaintiff received a CT scan of her abdomen and pelvis which revealed a soft tissue density area in the presacral region, which possibly represented postoperative scarring. (Tr. 995-96.) A nodule in the left upper lobe was also identified. (Tr. 996.) Plaintiff presented to Dr. Turner on August 2, 2013, with bilateral leg pain, which she claimed had persisted since the completion of

10

her chemotherapy in March. (Tr. 1479.) She told Dr. Turner she sometimes took up to four Norco tablets per day. *Id.* He opined the pain may have been due to her pelvic mass or a disc bulge. (Tr. 1481.) On August 7, 2013, plaintiff underwent a PET scan which revealed only low grade activity in the presacral space. (Tr. 991.) This reflected improvement when compared with the previous scan from May 12, 2013, as it was in the area of the previous abnormality. *Id.* It did not reach criteria for malignancy but possibly reflected some post-therapy inflammatory change. *Id.* On August 23, 2013, plaintiff presented to Dr. Turner with complaints of fatigue, malaise, weight loss, and coughing. (Tr. 1477.) She was told she had COPD. (Tr. 1476.) A chest x-ray revealed no acute cardiopulmonary process. (Tr. 1524.)

On September 5, 2013, Dr. Scott Ackley noted that plaintiff reported feeling fairly well and that she had a good appetite and energy level. (Tr. 987.) She reportedly experienced diarrhea on occasion when she was not careful with her diet but denied any new bowel or bladder problems. *Id.* On November 6, 2013, plaintiff received an ultrasound for pain in her limb and edema. (Tr. 984-85.) There was no evidence of deep vein thrombosis. *Id.* On December 2, 2013, plaintiff presented to Wabash Valley Surgery Center with complaints of diarrhea and constipation. (Tr. 960.)

5. **State Agency Consultants' RFC Analysis**

State agency physician Dr. B. Rock Oh first assessed plaintiff's RFC in October 2012. (Tr. 99-114.) Dr. Oh opined that plaintiff could occasionally lift and/or carry fifty pounds; frequently lift and/or carry twenty-five pounds; stand and/or walk for approximately six hours in an eight-hour workday; sit for a total of approximately six hours in an eight-hour workday; and push and/or pull for an unlimited amount of time. (Tr. 111-12.)

In February of 2013, state agency physician Dr. Viday Madala also assessed plaintiff's

RFC. (Tr. 117-135.) Dr. Madala opined that plaintiff had the same restrictions found by Dr. Oh. (Tr. 123.) Based on these limitations, Dr. Madala opined that plaintiff could perform light work and was not disabled. (Tr. 125.)

### 6. Dr. Turner's RFC Assessment

Dr. Turner completed an RFC assessment in April 2014 and opined that plaintiff could not lift ten pounds or more, could sit and stand for thirty minutes, and could walk 100 feet without interruption. (Tr. 1616-17.) He also opined that plaintiff could sit and stand for thirty minutes and walk up to fifty feet, in total, in an eight-hour workday. (Tr. 1617.) Dr. Turner credited plaintiff's limitations to her advancing COPD, colon cancer, nerve damage, and depression. (Tr. 1618.)

## Analysis

Plaintiff first argues that the ALJ erroneously concluded that plaintiff's testimony regarding her symptoms was not credible. "An ALJ is in the best position to determine the credibility of witnesses, and we review that determination deferentially." *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008). A credibility determination will only be disturbed if it is "patently wrong." *Id.* However, the finding must still be "supported by the evidence" and "specific enough to enable the claimant and a reviewing body to understand the reasoning." *Id.*

Here, the ALJ provided a specific reason for her unfavorable credibility determination: plaintiff's allegations were "inconsistent with the objective medical record and the record as a whole." (Tr. 33.) For instance, the ALJ noted that plaintiff told her doctor her bowels and bladder were working well, denied experiencing significant symptoms, and reported feeling well on multiple occasions. (Tr. 31-33.) The ALJ also considered that Dr. Manyam noted that plaintiff was tolerating chemotherapy well and that by 2013 her treatment involved mostly

12

observation. (Tr. 32.)

Plaintiff asserts that that ALJ improperly cited the fact that plaintiff smokes in order to undermine her credibility. While the ALJ does, in fact, point out plaintiff's smoking habit, (Tr. 31, 33), the ALJ was merely summarizing medical evidence and testimony. The ALJ did not, however, use plaintiff's smoking habit to support the adverse credibility determination.

Plaintiff next argues that the ALJ cherry-picked evidence to support a finding of non-disability and ignored evidence that pointed to disability. Although "[a]n ALJ has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts . . . [she] need not mention every piece of evidence, so long [as] [s]he builds a logical bridge from the evidence to [her] conclusion." *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010). The ALJ frequently cited to instances in the record where plaintiff complained of pain or other symptoms. The ALJ merely did not assign this evidence the weight plaintiff prefers, which is not grounds for reversal. *See id.* ("The ALJ specifically addressed all the evidence that [plaintiff] points out, though he did not assign the significance to it that [plaintiff] prefers."). For instance, the ALJ opined, "The medical record from 2013 also demonstrates the claimant complaints [sic] of musculoskeletal symptoms and breathing difficulties. However, objective diagnostic findings were generally mild and treatment recommendations were routine, involving routine medication management." (Tr. 32.) It is well within the ALJ's discretion to determine what weight to give plaintiff's subjective complaints based on other objective findings in the record. *Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007) ("Although a claimant can establish the severity of his symptoms by his own testimony, his subjective complains need not be accepted insofar as they clash with other, objective medical evidence in the record.").

Plaintiff also argues that the ALJ improperly concluded that plaintiff's symptoms were

not supported by objective medical findings. In support of her argument, plaintiff points to parts of the record that support plaintiff's complaints. However, the ALJ already considered this evidence and this court will not reweigh evidence or substitute its own judgment for that of the ALJ. *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997).

Additionally, plaintiff argues that the ALJ improperly considered that plaintiff gained weight throughout the disability period and had a generally stable condition. Plaintiff contends this information was irrelevant and an example of the ALJ failing to build a logical bridge between the evidence and the credibility finding. Plaintiff's argument may be more convincing had the ALJ relied solely on this evidence. However, the ALJ's findings were supported by other substantial evidence in the record, including the lack of evidence of significant associated symptoms or side effects (Tr. 31); plaintiff's own denials of symptoms (Tr. 32); a physical examination that indicated no abnormalities of plaintiff's lungs or extremities (*id.*); and mild treatment plans (*id.*). Thus, the ALJ's recognition of plaintiff's weight gain and stable condition does not constitute reversible error.

Next, plaintiff argues the ALJ impermissibly "played doctor" by discrediting the RFC findings of the state-agency consultants and plaintiff's treating physicians.

The ALJ first rejected the state-agency consultants' findings that plaintiff could perform medium exertional work. (Tr. 33.) She concluded,

> The medical record received at the hearing level demonstrates that the claimant had greater functional limitations than found by the State agency medical consultants. The undersigned finds it unlikely that the claimant would be able to perform work requiring medium exertion due to side effects of her cancer treatment, particularly during the period of her chemotherapy/radiation therapy and resection surgery.

(Tr. 33-34.)

The ALJ then rejected the assessment of Dr. Turner, plaintiff's treating physician,

because it was "extreme, poorly supported, and inconsistent with the medical record." (Tr. 34.) Particularly, the ALJ noted that Dr. Turner stated plaintiff could walk 100 feet continuously, but then stated in the same assessment that plaintiff was limited to walking fifty feet in total during an eight-hour workday. *Id.*

The ALJ also assigned "little probative value" to a statement by plaintiff's surgeon, Dr. Elizabeth Schmidt, that plaintiff could not work following surgery. *Id.* The ALJ found that the assessment was "time-specific and applicable only to the period proximate to the surgery." *Id.*

Finally, the ALJ gave little weight to a third-party function report from plaintiff's friend because it was based on plaintiff's subjective allegations which were not supported by the objective medical evidence in the record. *Id.*

Plaintiff cites *Suide v. Astrue*, 371 F. App'x 684 (7th Cir. 2010), for the proposition that once an ALJ discredits all medical opinions in the record, she cannot construct an independent RFC from the evidence. However, *Suide* does not stand for such a broad proposition, and the Seventh Circuit has clearly expressed that "the ALJ is not required to rely entirely on a particular physician's opinion or choose between the opinions [of] any of the claimant's physicians." *Schmidt v. Astrue*, 496 F.3d 833, 845 (7th Cir. 2007). The ALJ is still required, though, to build a "logical bridge" between the evidence and her conclusion.

Here, the ALJ summarized the medical record and articulated why plaintiff's subjective complaints were not entirely credible. However, she offered no specific support for her conclusion that plaintiff could perform light work with the exception of avoiding "concentrated exposure to fumes, odors, dusts, gases, and poor ventilation." The ALJ made the conclusory statement that "the above residual functional capacity assessment is supported by medical records from treating sources and examination and evaluation reports by consulting physicians."

15

(Tr. 35). The ALJ merely summarized the medical records and reached a conclusion, without building the logical bridge between the two. Because of this error, the case must be remanded. "If a decision lacks evidentiary support or is so poorly articulated as to prevent meaningful review, a remand is required." *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012) (internal quotations omitted).

Finally, plaintiff argues the ALJ erred by failing to give controlling weight to the opinions of plaintiff's treating physicians.

Pursuant to 20 C.F.R. § 404.1527(c), the Social Security Commission generally gives more weight to a medical opinion from the plaintiff's treating source, so long as it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [plaintiff's] case record." If an ALJ does not afford the opinion of a treating physician controlling weight, she must articulate "good reasons" for her decision. *Brown v. Colvin*, 845 F.3d 247, 252 (7th Cir. 2016) (quoting *Larson v. Astrue*, 615 F.3d 744, 749 (7th Cir. 2010)).

The ALJ, here, found that Dr. Turner's assessment did not warrant controlling weight because it was unsupported and both extrinsically and intrinsically inconsistent. (Tr. 34.) The ALJ noted the absence of subjective reports of symptoms and functional limitations consistent with the assessment, Dr. Turner's lack of explanation or support for the assessment, and the inconsistent findings within the report regarding plaintiff's limitations on walking. *Id.* The regulations clearly state that a Commissioner should give controlling weight to the treating physician's opinions only when they are well-supported and not inconsistent. Because the ALJ found that Dr. Turner's opinions lacked these qualities, she was not required to give them controlling weight.

The ALJ also disregarded Dr. Schmidt's comment that plaintiff could not work after surgery. *Id.* The ALJ assigned the statement little probative value because it was made a few days after plaintiff's resection surgery, and was, therefore, most likely time-specific. *Id.* The ALJ also pointed out that "Dr. Schmidt's statements and conclusions concerning plaintiff's disability are on an issue specifically reserved under the Regulations to the Commissioner." (Tr. 34.) Plaintiff contests this finding and argues that the ALJ should have given the opinion controlling weight. Because a physician's opinion as to an individual's ability to work is not a medical opinion, the ALJ did not err in disregarding Dr. Schmidt's statement.

## Conclusion

The Commissioner's final decision denying Susan E. Arnold application for social security disability benefits is **REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. § 405(g).

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**
**DATE: June 5, 2017**

                                                        s/ J. Phil Gilbert
                                                        **J. PHIL GILBERT**
                                                        **DISTRICT JUDGE**